T. C. PERRY, DARIUS WHITE, AND H. G. WHITE v. NORFOLK SOUTHERN RAILROAD COMPANY.

(Filed 10 November, 1920.)

1. **Railroads—Collisions— Negligence— Contributory Negligence— Crossings—"Stop, Look, Listen"—Evidence—Questions for Jury.**

While it is evidence of contributory negligence for the plaintiff to drive his automobile upon the defendant's track at a public crossing without stopping, it may not be so held, as a matter of law, when he slowly and cautiously had approached the track, had looked and listened, and was prevented from seeing the coming train by growth that the defendant had permitted to remain on its right of way, or from knowing that the train was approaching because of the failure of defendant's employees to sound the whistle or ring the bell of the locomotive.

2. **Railroads—Collisions—Signals—Negligence—Evidence.**

It is the duty of the employees of a railroad company to give reasonable and timely notice of the approach of its train to a public crossing, by ringing the bell or blowing the whistle of the locomotive, or doing both, when the circumstances demand it, and its negligence in the failure to

perform this duty may be shown upon the testimony of nearby witnesses to the effect that they did not hear the whistle or the bell at the time of the injury.

**3. Same—"Stop, Look, Listen"—Proximate Cause—Questions for Jury.**

Upon evidence that the plaintiff did not stop on a public highway before entering on the defendant railroad company's right of way while driving an automobile, resulting in a collision with defendant's train, and that the plaintiff was prevented from seeing or hearing the approach of the train by the negligence of the defendant in failing to give warning by ringing its bell or blowing its whistle, and permitting growth to remain upon its right of way, and that the plaintiff was carefully observant and slowly driving at the time of the collision: *Held*, the question of proximate cause is presented upon the issue of contributory negligence.

**4. Railroads—Negligence— Contributory Negligence— Crossings— "Stop, Look, Listen"—Signs.**

A sign maintained by a railroad company at its crossing with a public highway, for travelers thereon to "Stop, look, and listen," has no other legal effect than to call to their attention the duty imposed upon them by law to exercise ordinary care for their own safety.

WALKER, J., dissenting.

APPEAL by defendant from *Devin, J.*, at the February Special Term, 1920, of PASQUOTANK.

This is one of three actions, two to recover damages for personal injury, and the third, damages for loss of services of a minor son, brought on account of injuries sustained at a public crossing by the train of the defendant striking an automobile in which the plaintiffs were.

The plaintiff Perry was driving the automobile. He testified as follows: "I was 55 years old last August, and live near Okisko. The railroad crosses the public road at Pasquotank station. The road has been there ever since I can remember. It was there and maintained by the county at the time the railroad laid its track across it, and has been there ever since. It is the main road. It is traveled more than any road we have. It is about the only way, except by going around by Okisko to come to Elizabeth City.

"I was hurt on 16 August, 1918, somewhere between three and four o'clock in the afternoon. I was going home. I live about one and one-half miles or one and one-fourth miles from Pasquotank station. In going from Elizabeth City to my home I crossed the railroad at that station. The right of way of the railroad between the track and where its boundary was grown up in sycamore bushes, different kinds. The sycamore bushes there were higher than anything else, some eight or ten feet high, the sprouts sprouted off and made a pretty good clump; they had very wide leaves, so you could not see until you got up on the rail-

road bed. The train was coming from my left. There is a field of corn that butts up to the right of way. I should judge the road is four or five hundred yards from the woods. The corn was eight or ten feet high.

"It is some thirty-three feet, I suppose, from the edge of the right of way to the middle of the track. You could not see up the road where the train was coming, until you climb on top of the road bed, because the bushes had grown up there and you could not see it. They were on the right of way. The train that struck me was known as 'Waddy's train,' and was coming from Edenton going towards Norfolk. That was on my left. I was in a Ford automobile. I was not going over four or five miles at least at that time. I was climbing the road bed. Up to the time I got to the right of way I was going twelve or fifteen miles; that's as fast as I ever go any time. When I got to the right of way I slowed down. I heard no train, no sound.

"Q. Did you listen for one? A. Yes, sir.

"Q. And you didn't hear it? A. No, sir.

"Q. Did you look? A. Yes, sir. I never heard one until I got up to the track.

"Q. Did the train blow? A. I didn't hear it.

"Q. Ring any bell? A. I didn't hear it.

"Q. State what signal, if any, it gave crossing the public road? A. I didn't hear it.

"I was not running over four or five miles at the outside when I drove up the railroad. As I drove up on the track I had two others with me; Darius White, a young white man, and Mr. Oscar Bundy. When I drove up on the track the train looked as close as from here to that door. I reached down for the clutch and brake, and tried to back off, and by the time I got my foot on the clutch the train hit me. All the time I was slowing the automobile. The train was going at lease forty-five or fifty miles an hour. I just got the front wheels up on the track. It knocked us in every direction. I could not say how far, because I was knocked so badly I did not know but very little afterwards, until I was put in the hospital. I was knocked out of the car and alongside of the road bed. I was lying right side of the ties when the train was running by me.

"In August, 1918, Pasquotank was a flag-stop, and for this train, and it had been for a number of years before that. I knew that the trains of the Norfolk Southern never stopped at that station except when signaled to do so. They had sold no tickets there. I never bought any ticket there. There are three or four houses right near there. The nearest one is Mr. Henry Whitehead's. Mr. Whitehead had another little house across the road which belonged to him. There are about six

houses within one-half mile. There are and never have been any gates across the railroad at that point. But there is and has been for the last eight or ten years, certainly, if not longer, a sign there, 'Stop, look, and listen, railroad crossing.' That sign is there on the side of the county road on the other side of the railroad in the direction I was going. I could not say how long it has been there. I suppose five or six years. I suppose I saw it on the occasion in question. I don't know I was particularly noticing that one thing though. I know it was there then. The railroad is straight along there for a considerable distance. For a mile, as I understand it, clear to Okisko.

"Q. When did you slow down from twelve to four miles an hour? A. Right at the track.

"Q. How close to the track? A. Twenty-five or thirty yards I began to slow down.

"Q. You began to slow down when you were twenty-five or thirty yards away? A. Yes, sir.

"Q. You began to slow down then? A. It might have been sooner, I could not say.

"Q. Well sir, when did you commence to run at the rate of four miles an hour? A. When I was going up on the track.

"Q. How far from the track were you when you first commenced running four or five miles an hour? A. Well, I guess that track, you say, is thirty-three feet, I understood you? Q. Yes. A. For instance, when I struck the roadbed raise, that was when I was not running over four or five miles.

"Q. How fast were you running when you struck the right of way? A. I call it all the roadbed—the right of way. I am positive I was not running over four or five miles when I struck the right of way.

"I could have stopped my car in three feet or less. I did stop after I got on the track. I saw the sign up there for me to stop, look, and listen, and I did not stop until I got on the track. If I had stopped eight or ten feet from the track I might have heard the train. If I had stopped my car, no matter if the train was ringing the bell or sounding the whistle, I would have heard it coming, when it was a hundred yards from me, if I had looked in that direction. I can hear a train coming half a mile, and I can always hear it coming a quarter of a mile away, if I listen.

"Q. As a matter of fact, when you were as much as ten feet from the track, how far was the train from the crossing? A. I don't know about that. I never saw the train until I got up on the track. I never heard any noises, no sound, no whistle.

"Q. Well, you did not listen? A. I was running my car.

"Q. Well, if there was anything that kept you from hearing it on that day it was because your car was running, and not because the train was not making the usual amount of fuss? A. I don't know.

"Q. You won't say no? A. No.

"Q. If anything prevented your hearing that train on that day when you were ten feet from the track it was the running of your car? A. I could not say.

"Q. I understand you to say this: You can easily hear a train running on the track, whether it is blowing or sounding the whistle, as much as a quarter of a mile away? A. Well, it is owing to what you are in. Cars make a noise as well as the train.

"Q. Then if you can ordinarily hear it when it is that distance away when your car is not running, then if you don't hear it and your car is running, the reason you didn't hear it is because the car is running? A. Might have been; I don't know. .

"If my car had not been running that day I suppose I would have heard the train when it was within one hundred yards of me. I could not say whether I have ever been within a hundred yards of a train running, and was in an automobile running at that time, and did not hear it. Most any man could hear a hundred yards if he had nothing to break the sound. I cannot tell the jury that the whistle did not blow or the bell did not ring."

There was other evidence in corroboration of the plaintiff.

The defendant introduced evidence tending to prove that the crossing was in good condition, and that the whistle was blown and the bell rung as the train approached the crossing.

There was a motion for judgment of nonsuit, which was overruled, and the defendant excepted.

There was a verdict and judgment for the plaintiffs, and the defendant appealed.

*Aydlett & Simpson for plaintiffs.*
*Thompson & Wilson for defendant.*

ALLEN, J.   The principles announced in *Goff v. R. R.,* 179 N. C., 219, fully sustain the ruling of his Honor in refusing to enter judgment of nonsuit.

It was there held that it was the duty of the defendant to give reasonable and timely notice of the approach of its train to a public crossing by ringing the bell or blowing the whistle, or by doing both when peculiar conditions demanded; that a failure to do so is negligence, and that the evidence of witnesses nearby who testify that they do not hear the ringing of the bell or the blowing of the whistle, is evidence that no such signal was given.

We also approved in that case the following principle as to the duty of the traveler as he approaches the crossing, laid down in *Johnson v. R. R.,* 163 N. C., 443:

"4. On reaching a railroad crossing, and before attempting to go upon the track, a traveler must use his sense of sight and hearing to the best of his ability under the existing and surrounding circumstances—he must look and listen in both directions for approaching trains, if not prevented from doing so by the fault of the railroad company, and if he has time to do so; and this should be done before he has taken a position exposing him to peril or has come within the zone of danger, this being required so that his precaution may be effective. *Cooper v. R. R.,* 140 N. C., 209; *Coleman v. R. R.,* 153 N. C., 322; *Wolfe v. R. R.,* 154 N. C., 569, in the last of which cases the rule was applied to an employee charged with the duty of watching a crossing and warning travelers of the approach of trains, and he was required to exercise due care, under the rule of the prudent man, for his own safety by looking and listening for coming trains.

"5. The duty of the traveler arising under this rule is not always an absolute one, but may be so qualified by attendant circumstances as to require the issue as to his contributory negligence, by not taking proper measures for his safety, to be submitted to the jury. *Sherrill v. R. R..* 140 N. C., 255; *Wolfe v. R. R., supra.*

"6. If he fails to exercise proper care within the rule stated, it is such negligence as will bar his recovery: *Provided, always,* it is the proximate cause of his injury. *Cooper v. R. R., supra; Strickland v. R. R.,* 150 N. C., 7; *Wolfe v. R. R., supra.*

"7. If his view is obstructed or his hearing an approaching train is prevented, and especially if this is done by the fault of the defendant, and the company's servants fail to warn him of its approach, and induced by this failure of duty, which has lulled him into security, he attempts to cross the track and is injured, having used his faculties as best he could, under the circumstances, to ascertain if there is any danger ahead, negligence will not be imputed to him, but to the company, its failure to warn him being regarded as the proximate cause of any injury he received. *Mesic v. R. R.,* 120 N. C., 490; *Osborne v. R. R., supra.*"

The evidence in this case tends to prove that as the plaintiff approached the crossing his view was obstructed by bushes, which the defendant permitted to grow on its right of way so high and so close to the track that he could not see until he was on the track; that the bell was not rung and the whistle was not blown; that the plaintiff was traveling at from four to five miles an hour; that he looked and listened, and the inference is permissible that if notice of the approach of the

train to the crossing had been given that the plaintiff would have heard it and would not have gone on the track, and if so, the jury was justified in finding that the failure to give notice caused the plaintiff to go upon the track and was the proximate cause of his injury.

Some authorities impose the further duty on.the plaintiff of stopping before reaching the crossing, while others hold that this cannot be declared as matter of law, but that a failure to do so is a circumstance to be considered on the exercise of ordinary care by the plaintiff.

The authorities representing the opposing views are collected in the notes to *Wacksmith v. R. R.,* 1913 B. Anno. Cases, 681, but as the question has been decided by this Court four times in recent years, as applied to collisions between automobiles and trains at public crossings, and a definite conclusion reached without dissent, we do not regard it as needful or helpful to go outside of our own authorities, and reëxamine the decisions of other Courts, which we have heretofore fully considered.

*Shepard v. R. R.,* 166 N. C., 545, was an action to recover damages to an automobile caused by collision with a train at a crossing, and the question was raised as to the duty of the driver to stop, and the Court said: "It is also established by the weight of authority that it is not always imperative on a traveler to come to a complete stop before entering on a railroad crossing; but 'whether he must stop, in addition to looking and listening, depends upon the facts and circumstances of each particular case, and so is usually a question for the jury.' *Alexander v. R. R.,* 112 N. C., 720; *Judson v. R. R.,* 158 N. Y., 597; *Malott v. Hawkins,* 159 Ind., pp. 127-134; 3 Elliott on Railroads (2 ed.), sec. 1095, note 147; 33 Cyc., pp. 1010, 1011-1020."

A new trial was ordered because of ·an error in the charge, and on a second appeal (169 N. C., 239) the principles declared on the first appeal were not only affirmed, but the Court proceeded a step further and held that the plaintiff could recover although he approached the crossing running in excess of the speed limit prescribed by statute, unless it appeared that the excess of speed was the proximate cause of the collision, and that this was for the jury.

*Hunt v. R. R.,* 170 N. C., 444, was an action to recover damages for wrongful death caused by a collision between an automobile and a train at a crossing, in which the Court says: "There was evidence tending to show that the driver of the automobile looked and listened before entering on the crossing, and it is held with us that it is not always, and as a matter of law, required that a vehicle should come to a stop before endeavoring to cross. *Shepard v. R. R.,* 166 N. C., 539, and *Elkin v. R. R.,* 86 S. E., 762."

*Brown v. R. R.,* 171 N. C., 269, is another action to recover damages for injury at a crossing caused by collision between an automobile and

a train. *Walker, J.,* writing the opinion for the Court, reviews the authorities, and, among other things, declares: "We held in *Shepard v. R. R.,* 166 N. C., 539, following two of the rules laid down in *Cooper v. R. R.,* 140 N. C., 209, and *Johnson v. R. R.,* 163 N. C., 431, as follows: 'Where the view is unobstructed, a traveler who attempts to cross a railroad track under ordinary and usual conditions without first looking, when by doing so he could see the approach of a train in time to save himself by reasonable effort, is guilty of contributory negligence. Where the view is obstructed, a traveler may ordinarily rely upon his sense of hearing, and if he does listen and is induced to enter on a public crossing because of the negligent failure of the company to give the ordinary signals, this will usually be attributed to the failure of the company to warn the traveler of the danger, and not imputed to him for contributory negligence.' . . . *Shepard's case* was again before the Court, and is reported in 169 N. C., 239, where the former decision was approved, and where it was further held that if plaintiff (in that case) was running his automobile at a rate of speed prohibited by the statute (Laws 1913, ch. 107), he was not, as a matter of law, debarred of a recovery, as the question of proximate cause was involved and was for the jury to determine."

And again, referring to *Shepard's case:* "In that case, at p. 545, the Court said: 'It is also established by the weight of authority that it is not always imperative on a traveler to come to a complete stop before entering on a railroad crossing'; but 'whether he must stop, in addition to looking and listening, depends upon the facts and circumstances of each particular case, and so is usually a question for the jury.' "

These three cases of *Shepard v. R. R., Hunt v. R. R.,* and *Brown v. R. R.* are cited and approved in *Dail v. R. R.,* 176 N. C., 112, on the point that failure to stop before crossing a railroad track cannot be declared to be contributory negligence as matter of law, but that it should be considered by the jury in connection with the surrounding circumstances in determining whether the party was exercising the care of one of ordinary prudence.

The authorities favoring this view proceed upon the idea that the traveler has the right to rely upon the performance of its duty by the defendant, and that when he looks and listens and neither sees nor hears a train, he has the right to act upon the presumption that none is approaching.

Also that while a failure to stop should be considered in connection with the other circumstances, it is not conclusive of negligence on the part of the plaintiff.

The sign placed at the crossing with the warning "Stop, look, and listen" has no other legal effect than to call the attention of the plaintiff

to the duty imposed upon him by law to exercise ordinary care for his own safety.

His Honor, however, gave the defendant the benefit of all it was entitled to, as he instructed the jury as follows: "If you shall find that the view down the railroad track was obstructed or restricted, and that the plaintiff could not hear on account of the noise of his automobile, then it was his duty to bring his car to a stop before entering upon the track, and to stop, look, and listen at a place where doing so would be effective, and if you find that there was a place on the road where the view was sufficiently open for him to have done so and have ascertained the approaching of the train, then his failure to do so was contributory negligence, and you will answer the second issue 'Yes.'"

The evidence of the plaintiff that he might have heard the running of the train if he had stopped was submitted to the jury in support of the defendant's position, and was given the significance to which it was entitled.

The notice to which the plaintiff was entitled was not the noise of the moving train, but the blast of the whistle or the ringing of the bell, or both, and while he might have heard the train if he had stopped, it is also true that he might have been halted before he reached the track, with the car running, if the signals required by law had been given, and it could not be said to be contributory negligence as a legal conclusion if the failure to stop was caused by the breach of duty on the part of the defendant in that it failed to give any notice of the approach of its train.

Notice by bell or whistle is required, because the noise of the train, which is always present, is not a sufficient protection to life and property, and when the defendant has by its negligence permitted obstructions on its right of way so the traveler cannot see, and has failed to give the proper signal, which prevents him from hearing what he has the right to expect if a train approaches, it ought not to be absolved from the consequences of its negligence, because the traveler, relying on the performance of duty by defendant, might have heard the noise of a train if he had stopped.

There are several exceptions to the evidence, which we have examined, and none of them would justify ordering a new trial, nor do the other appeals involve additional questions which require discussion.

The case of *Hurst v. R. R.*, which was disposed of by a *per curiam* judgment in favor of the defendant, is in some respects like this, but the question on which it was decided was the condition of the crossing and not the failure to give notice of the approach of the train.

After careful examination of the record we find

No error.

WALKER, J., dissenting: Statement of essential facts.

These·three cases, which grew out of the same accident, were, by consent, tried together below, and by consent are heard together in this Court upon one record, which is applicable to each, and they arose out of a collision between an automobile and a railroad train—the sort of accident that has become all too prevalent in these days of reckless driving along our country roads by those in charge of what seems to be one of the most deadly machines in existence, when not carefully driven.

On 16 August, 1918, about 3:30 o'clock in the afternoon, the plaintiff, T. C. Perry, was driving his Ford automobile from Elizabeth City to his home near Okisko, down the country road which crosses the railroad of defendant at Pasquotank station, it being a flag-stop for the trains of defendant, and a place where no tickets are sold, where none of the trains ever stop, unless signaled to do so, and within the radius of half a mile of which there are only about six houses. In the car with Mr. Perry, who was driving, were the plaintiff Darius G. White, who is a boy about sixteen years of age, and a man by the name of Oscar Bundy. Plaintiff Perry and Mr. Bundy were sitting on the front seat, the boy and part of a cake of ice were in the rear of the machine. Plaintiff Perry was driving, and consequently was on the left side of the car, which was the side in the direction of which the train in question was approaching. He had been running at a speed of twelve to fifteen miles an hour, but according to his testimony had slowed down to four or five miles an hour when he got to the right of way, which was about 33 feet from the center of the track. The roadbed is some higher than the right of way, and also considerably higher than the country road. On the side of the track, in the direction opposite to which the car was approaching, in plain view of plaintiff and those in the car as they drove up, was a crossing sign with the words "Stop, look, and listen" upon it, as will clearly appear in the photograph taken by the witness Davidson and sent up as an exhibit. The map made by the witness Mathew, and also sent up as an exhibit, shows the distances and elevations.

Plaintiff Perry had been living at Okisko all of his life, had frequent opportunities to be at Pasquotank station, had gotten on the train there a number of times, and for the past twenty years he had traveled the country road and crossed the railroad at Pasquotank station, possibly half a dozen or a dozen times a month. He knew that, at the time in question, Pasquotank station was a flag-stop for the train in question, and that it had been such for a number of years, and that trains only stopped there when signaled so to do. He knew the schedule of the train and that there had been no change in it for at least five years. He

PERRY *v.* R. R.

knew there had never been any safety gates across the railroad at that crossing; he knew the sign, "Railroad crossing, stop, look, and listen," had been there for eight or ten years, if not longer. He knew that the view down the track from the country road was obstructed by the corn in the field of J. H. Whitehead, which extended up to the right of way, or some thirty-five feet of the track. Plaintiff further knew that there were some sycamore bushes growing in a ditch near the track which he claimed obstructed the view down the track, which was straight for over a mile. These bushes were more than three feet from the track. Plain-tiff Perry, although conscious of all these things, did not stop his car until after he got on the track. He testified:

"I did not stop until I got on the track. If I had stopped eight or ten feet from the track I might have heard the train. If I had stopped my car, no matter if the train was not ringing the bell or sounding the whistle, I would have heard it coming when it was a hundred yards from me. I can hear a train coming half a mile, and I can always hear it a quarter of a mile away if I listen.

"Q. As a matter of fact, when you were as much as ten feet from the track, how far was the train from the crossing? A. I don't know about that. I never saw the train until I got up on the track. I never heard any noises, no sound, no whistle.

"Q. Well, you did not listen? A. I was running my car.

"Q. Well, if there was anything that kept you from hearing it on that day it was because your car was running, and not because the train was not making the usual amount of noise? A. I don't know.

"Q. You won't say so? A. No.

"Q. If anything prevented your hearing that train on that day when you were more than ten feet from the track, it was the running of your car? A. I could not say.

"Q. I understand you to say this: You can easily hear a train running on the track, whether it is blowing or sounding the whistle as much as a quarter of a mile away? A. Well, it is owing to what you are in. Cars make a noise as well as the train.

"Q. If you can ordinarily hear it that distance away when your car is not running, then if you don't hear it and your car is running, the reason you didn't hear it is because the car is running? A. Might have been; I don't know. If my car had not been running that day I sup-pose I would have heard the train when it was within one hundred yards of me. I cannot tell the jury that the whistle did not blow or the bell did not ring.

"Q. As a matter of fact you were not thinking about the train? A. I don't know that I was so much, only getting home."

After plaintiff Perry drove on the track and stopped his car, defendant's train, which was running practically on schedule time, ran into it and knocked it off and threw the occupants out, injuring Mr. Perry and the boy.

Mr. Perry and the boy instituted actions for personal injuries, and the father of the boy for damages on account of loss of the services of his son. The jury returned a verdict of $4,500 for T. C. Perry and Darius G. White, and $500 for H. G. White. The court gave judgment thereon, and defendant appealed.

To my mind the above is a startling result. If plaintiffs are entitled to a verdict for the heavy damages they received, or even for any damages for injuries received under the circumstances of this case, then it would seem, as I will show hereinafter, that a railroad is almost practically helpless in our courts, as against the suit of a careless and reckless driver. I will try to demonstrate, and I think I must surely succeed in doing so, that the doctrine of imputed negligence cannot shield the two Whites, as the proximate cause of Darius G. White's injury was not the fault of the railroad company, but that of his companion, T. C. Perry, the driver of the car in which he was when the collision took place, even if his own fault was not also proximate thereto. *Crampton v. Ivie Bros.,* 126 N. C., 894. I will refer to this case more at large when I reach the proper place for a discussion of it. At present I am merely stating the grounds of my dissent.

The motion to nonsuit should have been granted, and this brings me to a consideration of the evidence in the light of the law and well settled principles in this Court. The plaintiffs base their right to recover upon these grounds: 1. Failure of the engineer of the train to blow his whistle. 2. Running the train at an unusual speed. 3. Permitting bushes and weeds to grow on its right of way. First. There was ample evidence to prove that the engineer blew one long whistle for Pasquotank station, and in about two or three seconds thereafter he sounded the road-crossing blow—two long and two short, and then he put on the emergency brakes and stopped the train. Mr. Winslow, a witness, and not connected with the railroad company in any way, testified that he was at Okisko when the train in question left the station for Pasquotank, saw the train leave Okisko, and heard its whistle blow before it reached Pasquotank, and about the whistle post. There was one long blast and then two or three short ones. There was much other testimony from persons who saw the train, and were near the track of the railroad between Okisko and Pasquotank, and who stated that they heard the whistle blow twice and heard the bell ringing. Some one phoned to Okisko about fifteen minutes after he heard the train blow and told about the collision. Mr. Daughtrey testified that Mr. Perry

stated immediately after the accident that "he did not know what he could have been thinking of, and that it was nobody's fault but his own," and that, in my opinion, after a most careful study of the entire evidence, is a perfectly correct description of the true situation. The physician (Dr. H. D. Walker) who looked after the injured men and carried them to St. Vincent's Hospital in Norfolk, Va., testified that on the way to the hospital "Mr. Perry said—in fact Mr. Bundy, too—that they had been to Elizabeth City to get some ice. They had a sick horse and were on the way home. When they got to Pasquotank station, in an effort to cross the track, they were hit by the train; they didn't see the train; didn't even think anything at all about the train." There was evidence that the vision either north or south was not obstructed, and especially that the bushes, spoken of by plaintiffs' witnesses, were not high enough to interfere the least with it. The sycamore bushes in the ditch were about four or five feet high, and only two or three bushes, and down the road about a hundred yards a small cluster of bushes, three or four feet high, but they did not obstruct the view at all, and box cars could easily be seen at a distance of 400 yards or more. Whitehead's corn field was about thirty-five feet from the center of the track, and of course could not obstruct the view. Mr. Rowland, one of the witnesses who testified to the above facts as to the obstruction of the view, also stated that he said to Mr. Perry: "Crowden, what made you let the train bump you like that?" To which he replied, "I don't know, for I did not have my mind on the train." Mr. Whitehead, a farmer, who owned the corn field, testified that he examined the track carefully, and found that there was nothing to obstruct the view, and he could stand at the corner of his fence at the right of way and see as far as Okisko, a mile from there, the track being straight at that part of it, and that he saw box cars at the distance of 400 yards on the other side of the main track, and that the same was true standing at any place between the corner of his fence and the railroad track. Mr. Perry said to several other persons than those already mentioned, and who have no interest in the controversy, when asked how the collision happened: "I don't know; I was not thinking about the train until we ran together," or "I don't know, to save my life, what I was thinking about," or "I was not thinking about anything but getting home." These witnesses were friends of Mr. Perry, and one of them stated that he was a "particular friend." The engineer testified that he was running at the usual speed, about 35 or 40 miles an hour, and was two minutes late. He blew the station signal, as Pasquotank was not a regular station but a signal station, and when there was no response from the station-master he blew the crossing signal. That he could not see Mr. Perry until after his car had emerged from behind the corn in the field, and that it was not

possible for him to stop his train before hitting him, but that Mr. Perry had ample time to stop. He further said: "When he got in a few feet of the crossing he just gradually began to stop, and stopped with his front wheel right on the rail, and the car, I suppose—its right much up-grade—would have rolled back, but there's about three-inch space between the rail and the inside crossing plank, and it checked there and the car· stuck." There is much more testimony of the same general kind, but it is not necessary to give it in detail. There was evidence that Mr. Perry knew the road he was traveling very well, having passed over it for some time, and several times a week. He lived one and a half miles from Pasquotank station.

There was a sign, placed there by the defendant, immediately in front of a person approaching the track, with the words upon it, in large letters, "Railroad crossing—stop, look, and listen." It could easily be seen by every one who attempted to cross the track at the place where the accident occurred.

The plaintiff testified that he could not hear the whistle blast, because his car was running at the time and making a noise, and he could not hear, because the public road over which he was traveling was sandwiched between thick forests, which also obstructed his hearing. But the defendant was not responsible for the forests being there, and no negligence can be imputed for that reason. If the plaintiff was prevented from hearing or seeing because of these impediments, even up to the track, his plain duty, as I will presently show, was to stop his car and go where he could see and hear before entering upon the track. Common prudence would suggest this to every man, situated as he was according to his own testimony. But he had at least eight feet of clear space where he could have seen from his car, or heard *from his car,* and certainly if he had stopped his car, and thereby its noise, and this is true according to his own testimony, for he stated that he could easily hear the noise or rumbling of a train, and much more the sound of its whistle, a quarter of a mile when there is no noise, like that of an automobile, to prevent. But if he was handicapped by the forests and also by the corn, which were not there by the defendant's fault, or by small sycamore bushes on the edge of the ditch and near the track, it was not only gross negligence to have entered upon the railroad crossing without "stopping, looking, and listening," as he was warned to do, or as he should have done without any warning. He could have done these things as proper measures for his safety without leaving his seat in the car, and the situation would *plainly* dictate such a course as a manifest precaution to be adopted by a prudent man. "The degree of caution he (the traveler) must exercise (at a railroad crossing) will be affected by the situation and surrounding circumstances. In crossing a railroad

there is obvious and constantly impending danger, not easily or likely to be under the control of the engineer." 3 Sherman & Redf. on Negligence (6 ed.), sec. 654, p. 1713; *Moebus v. Herrman,* 108 N. Y., 349; *Eaton v. Crisp,* 94 Iowa, 176; *Hall v. Ogden R. Co.,* 13 Utah, 243. No omission of the railroad company, such as failure to give crossing signals, will excuse the traveler on a highway from exercising proper and adequate care, and taking due precaution for his own safety before entering upon a railroad crossing. The danger is so very great that the care to be used should be exactly proportioned to it, and to enter upon so perilous a place as a railroad crossing blindly, or without knowing if there is imminent danger, or that a train is approaching, is not only gross negligence, but rashness, and even recklessness. But plaintiff knew the schedule and that a train was then due, hence the greater his negligence. Plaintiff took his life in his own hands. The terrible result was due to no culpable fault of the defendant.

"If his (the traveler's) view is obstructed in any degree or from any cause (even by the fault of the railroad company), he must look again after passing the obstruction, and if he cannot see, he must listen with increased vigilance. So, also, if for any reason he cannot hear distinctly, he must use all the more vigilance in looking. . . . It is no excuse for failure to look and listen that the traveler did not think, just then, about the railroad or its dangers, or that his attention was diverted by some trivial matter, or that he believed that all trains stopped short of the crossing, or that no regular train was due, or that a train had recently (but not immediately) passed, or that the usual or statutory signals of approaching trains were not given. Though it has often been said that the traveler has the right to rely on the railway company doing its duty, as by the giving statutory signals, and if injured in consequence of its failure to do so, he has his action, no Court has, it is believed, ever held that such failure on the part of the company dispensed with all care for his own safety by the traveler." 2 Sherman & Redf., sec. 476, at pp. 1201, 1202, 1203, 1204.

The railroad track is itself a warning of danger, as has been held by all the Courts, and especially by ours. *Abernathy v. R. R.,* 164 N. C., 91, and cases cited; *R. R. v. Houston,* 95 U. S., 697; *R. R. v. Hart,* 87 Ill., 529; *Smith v. R. R.,* 141 Ind., 92; *Boyd v. R. R.,* 50 Wash., 619. Said one of those Courts: "A party cannot walk (or drive) carelessly into a place of danger." *Houston's case, supra.* The plaintiff, without hearing or seeing a train approaching, because of the noise of his Ford car, and being warned by the railroad company to "stop, look, and listen," and without actually knowing whether a train was coming or not, and apparently not caring whether it was or not, though he knew it was then due, drives upon the track where his car is

choked, or at least stopped, and is stricken by the train.  He could have stopped eight feet (at the lowest) distant from the track and seen up and down the track, according to the testimony, and even if he could not have done so, he should not have ventured upon so dangerous ground without stopping the car and ascertaining whether a train was coming or not, regardless of the notice given by the railroad company.  His conduct does and should defeat his action.

It has been held by a Court whose opinion we greatly respect that where a driver of a wagon and team, whose view and hearing were obstructed, and where the track was straight for about a mile in the direction a train was coming, failed to listen properly or to make sufficient outlook, but drove onto the track without stopping, or knowing whether a train was approaching or not—there can be no other inference than that such failure was the proximate cause of the resulting accident, and a verdict should have been directed for the defendant.  *Cable Piano Co. v. Southern R. Co.,* 94 S. C., 143.  And another Court, for whom we have the same high opinion, has held that "A traveler on a highway crossing is bound to look and listen for approaching trains before attempting to cross, and to use ordinary care to make looking and listening effective."  *Southern R. Co. v. Valentine's Personal Rep.,* 113 Va., 388. A traveler about to pass over a railroad crossing should *stop,* look, and listen if the situation requires it, by reason of his inability otherwise to hear or see approaching trains, in the exercise of reasonable care for his own safety; and his failure to do so, when there are noises to prevent his hearing or obstructions to prevent his seeing, bars his recovery. *Carnefix v. Kanawha & M. R. Co.,* 7 W. Va., 534.  It is practically admitted by the plaintiff that his hearing was prevented by the noise of his car, for he virtually says as much himself; and further, that when there is no noise he can hear the rumbling of the train a quarter or half a mile, and of course, the sound of the whistle much further.  But when must the traveler look or listen?  *Justice Brown,* for this Court, which was unanimous, said in *Coleman v. R. R.,* 153 N. C., 322 : "A writer in the Personal Injury Law Journal of July, 1910, declares that all conflicts of opinion on this subject may be avoided by adopting the common-sense rule that the traveler should look when about to enter upon the track.  'A look when about to enter the zone of danger for an approaching car is not only the most availing, but it is then that the most accurate and reliable judgment can be formed as to the safety of an attempt to cross.'  Personal Injury Journal, page 11; see, also, *Wexker v. R. R.,* 120 N. Y. Supp., 1020.  The duty of looking when one approaches a street railway crossing is not adequately discharged by merely looking as the dangerous point is approached, and then when it is reached going blindly forward.  *Baxter v. R. R.;* 190 N. Y., 439;

*Fowler v. R. R.,* 74 Hun., 144; *Coleman v. R. R.,* 98 Am. Dec., 349; affirmed 188 N. Y., 564. See, also, *Cranch v. R. R.,* 186 N. Y., 310. This is the standard of prudence fixed by *Trull v. R. R.,* 151 N. C., 550, where it is held that the traveler must look 'in time to save himself,' and by *Mitchell v. R. R.,* 153 N. C., 116; *Inman's case,* 149 N. C., 125, as well as by numerous other decisions of this Court. In *Mitchell's case* plaintiff had eleven feet unobstructed view up and down the track before reaching it. He failed to look, and it was held that his negligence was the proximate cause of his injury, and that he could not recover."

The Court said further, in that case, that the plaintiff looked when he could not see, his view being obstructed by bushes, and failed to look as he got near the zone of danger, when he could see, and drove right on the track. The evidence in our case is that there was a clear space of eight feet before going on the track, where plaintiff could see the train, but he did not look, and preferred taking the risk of outrunning the train, if there was one coming. His brother, who was his witness, testified that the corn field was 15 feet from the middle of the track, the right of way 32 feet on either side, and a clear space of 8 feet next to the track. This being so, there was no reason why the view down the track should be intercepted, in which event the *Coleman case, supra,* would be substantially on all fours with this one, and it is in all essential respects. According to the witnesses, not contradicted, plaintiff said repeatedly he was not thinking of the track or train. The case of *R. R. v. Freeman,* 174 U. S., 379, is, therefore, analogous to the case at bar. It was said there: "The oral testimony on the subject tended to show that Freeman neither stopped, looked, or listened just before attempting to cross the track: *Held,* the testimony tending to show contributory negligence upon the part of Freeman was conclusive, and that nothing remained for the jury, and that the company was entitled to an instruction to return a verdict in its favor." In the opinion, *Justice Henry Billings Brown* said: "She was (under the circumstances) bound to listen and look before attempting to cross the railroad track in order to avoid an approaching train, and not to walk carelessly into a place of possible danger. Had she used her senses she could not have failed both to hear and see the train which was coming. If she omitted to use them and walked thoughtlessly upon the track, she was guilty of culpable negligence, and so far contributed to her injuries as to deprive her of any right to complain about them. If using them she saw the train coming and undertook to cross the track, instead of waiting for the train to pass, and was injured, the consequences of her mistake and temerity cannot be cast upon the defendant."

Referring again to *Coleman v. R. R., Justice Brown,* for our Court, said, in that case: "From its very nature, and for public convenience,

the train has the right of way, but the law imposes upon the engineer the duty to give signals and to exercise vigilance in approaching crossings in order to avoid injury. The law imposes the equal duty upon the traveler when he reaches a crossing and before attempting to go on the track to both look and listen for approaching trains, for the traveler by doing so, if there is nothing in his way, can most certainly prevent a collision and save himself from harm. When he reaches the track it is no great hardship imposed upon the traveler to require him to exercise ordinary prudence and to cast his eye up and down the track. By so doing he has the last and most certain chance to prevent collisions and to save himself as well as the train, its crew and passengers from possible injury. In respect to cases of collision at crossings, *Judge Thompson* says: 'The leading rule is that there can be no recovery of damages where the negligence of the traveler contributed proximately to the injury, although the railway company was also guilty of negligence.' Thompson on Negligence, sec. 1605. He also said: 'A railroad crossing is itself a notice of danger, and all persons approaching it are bound to exercise care and prudence, and when the conditions are such that a diligent use of the senses would have avoided the injury, a failure to use them constitutes contributory negligence, and will be so declared by the Court.' Mr. Beach says: 'In attempting to cross, the traveler must listen for signals, notice signs put up as warnings, and look attentively up and down the track; and a failure to do so is contributory negligence, which will bar recovery. A multitude of decisions of all the Courts enforce this reasonable rule.' There are of course exceptions to this, as well as most other rules, but where the traveler 'can see and won't see' he must bear the consequences of his own folly. His negligence under such conditions bars recovery, because it is the proximate cause of his injury. He has the last opportunity to avoid injury and fails to take advantage of it. This is the law as laid down by practically all the appellate courts in this country as well as by the Supreme Court of the United States." See, also, *Schofield v. R. R.,* 114 U. S., 615; *Stead v. Imp. Co.,* 95 U. S., 161. But this doctrine as to the necessity of "looking and listening," and of stopping if need be, in order to do so effectively, has been consistently recognized by this Court in at least thirty-odd cases, beginning with *Parker v. R. R.,* 86 N. C., 221, and ending with *Mitchell v. R. R.,* 153 N. C., 116, and there are later cases.

If the view was obstructed it was more incumbent on the plaintiff to proceed with a greater degree of caution for his own safety than if unobstructed. If he could not see before reaching the track, he should have stopped at the margin of the track, where he could see instead of driving 4 inches onto the track and into the very jaws of death. It was an act of the greatest temerity, and reckless beyond question, to have

gone on without taking any heed of the obvious danger. The unexpected happened, as it may at any time and generally does, as his car stalled right on the track, and this is not the only accident of the same kind that has recently occurred in this State, or that has come under the observation of this Court in an official way. The railroad train cannot move off the track or turn to one side, and the public, whom the railroad company serves, should not be delayed by careless drivers on the highway, who can stop or turn aside their cars at will, for the purpose of getting a view of the track before going upon it. But another case well decided by this Court lays down a rule somewhat similar to that of the *Coleman case, supra,* and practically the same. *Justice Hoke,* who wrote the opinion for the Court, referring to the instruction of the judge to the jury, that the plaintiff in that case was excused from looking and listening, if the engineer had failed to give the signal of the train's approach to the crossing, said this was error, and then remarked: "The portion of the instruction, however, addressed more particularly to the feature of contributory negligence, by fair and reasonable intendment, can only mean that though a traveler in approaching a railroad track is required to look and listen, yet this obligation is not upon him, nor will the consequences be imputed to him, if he failed to look and listen when such failure was caused by the negligent failure of the railroad train to give the necessary signals; and this, where there was evidence tending to show that if he had looked he could have seen the approaching train in time to have avoided the collision, or at least to have saved himself by the exercise of reasonable effort. In this we think there was error which entitles the defendant to a new trial. It relieves the traveler of all obligation to look and listen when there is failure on the part of the defendant to give the usual and ordinary signals, and places the entire responsibility for such a collision on the railroad company. It would, in effect, practically eliminate the defense of contributory negligence when there had been a negligent failure to give the warning; for ordinarily it is only by looking and listening that a traveler can inform himself of dangerous conditions. This is not a just principle by which the rights of parties in cases like the present should be determined, nor is it supported by any well considered authority. The general rule is well stated in Beach on Contributory Negligence, as follows: 'In attempting to cross, the traveler must look and listen for signals, *notice signs put up as warnings,* and *look attentively up and down the track,* and failure to do so is contributory negligence, which will bar a recovery.' A multitude of decisions of all the Courts enforce this reasonable rule. It is also consonant with right, reason, and the dictates of ordinary prudence, and so much in line with the ordinary care which the average of mankind display in the daily

routine of life, that it would seem to be scarcely dependent upon the authority of decided cases in the law courts," citing *Randall v. R. R.,* 104 N. C., 410; *Mayes v. R. R.,* 119 N. C., 758; *Mesic v. R. R.,* 120 N. C., 490 *Laverentz v. R. R.,* 56 Iowa, 689; *Nixon v. R. R.,* 84 Iowa, 331; *Davis v. R. R.,* 47 N. Y., 400; *Rodman v. R. R.,* 125 N. Y., 526; *R. R. v. Brownell,* 39 N. J. L., 189.

The rule is not universal in its application, or always without exception, for under some possible circumstances, not present in this case, it may not apply. Among the cases cited in *Cooper's case, supra,* is *Mesic v. R. R.,* 120 N. C., 490, where this is quoted: "The rule is general and usual that whenever an approach to a public crossing over a railroad is made by any one in charge of a wagon and team, such person is bound to look and listen for approaching trains *and take every proper precaution to avoid a collision,* and this is so even though the approach be made at a time when no regular train is expected to pass; and in case the driver fails to look and listen and to take proper precaution to avoid a collision, and one does occur, the plaintiff cannot recover, even though the defendant was negligent in the first instance." In our case, as it appears from the testimony of the plaintiff's brother, Mr. J. I. Perry, who was his witness, a person approaching the crossing in a Ford car could see on the left a train coming down the track when within 8 or 10 feet of the track. He had then a clear and unobstructed view of the track for a long distance. This brings the case directly within the authority and control of the *Coleman* and *Cooper* cases. There is another decision of more recent date, where the facts were substantially like those now before us, in which the Court decided, *per curiam,* that there was no legal merit in the plaintiff's case, and nonsuited him, considering, of course, that the facts were so clearly against his contentions as to require no opinion from the Court. I fear this contrary decision will impair the authority of those three cases, if it does not overrule them, by being in direct conflict, I think, with what they held. *McAdoo's case,* 105 N. C., 140, also sustains my view.

The speed of the train makes no difference, and cannot change the result, which should follow from what has been said. *McAdoo v. R. R., supra.* Plaintiff, by the exercise of proper care, could just as easily avoid a collision with a fast-moving train as with a slow-moving one, as he could see or hear the one fully as well as he could the other. The speed could not prevent his hearing, or seeing. *McAdoo's case, supra,* has frequently been approved. See, also, 105 N. C. (Anno. Ed.), at p. 154. I know of no statute, or common law, limiting the speed of trains, running in the country, to any specified mileage. It were better that plaintiff and his guests should be delayed a little, than that the

public should be retarded, especially as plaintiff and his guests had time to spare, though he was in a hurry to get home, but for no special reason.

The plaintiff himself testified that the crossing sign, with the words on it, "Railroad crossing—stop, look, and listen," had been there 8 or 10 years, or perhaps longer. He had seen it often, and it was there on the day and at the time of the accident. He could see it easily, and did see it. We have seen from authority (Beach on Negligence) that it was his legal duty to take notice of it and heed its warning, and to govern his conduct accordingly, which he did not do. It was his duty to "Stop, look, and listen" anyhow, without the sign, but more exactingly and impressively his duty in the very presence of it.

As to the passengers in the car with Perry. The rule applicable to them is stated in *Crampton v. Ivie Bros.*, 126 N. C., 894. (On petition to rehear.) There it is held that while generally speaking the negligence of the driver is not to be imputed to a passenger who is his guest by invitation, yet the question of *proximate cause* is always to be considered, and if the negligence of the driver proximately caused the injury, neither he nor his passengers can recover, and for the simple reason that the defendant was not *legally* at fault. It is there decided that if the defendant's negligence did not proximately concur with that of the driver in causing the injury, the plaintiffs, who were the guests of the driver, cannot recover, and if the driver's negligence was the proximate cause of the injury, plaintiffs, the guests, must, in law, look to their driver and not to the defendant. Under this principle, even if defendant was negligent in not giving a signal, by bell or whistle, of the approach of its engine to the crossing, it was not the proximate cause of the injury, as it preceded defendant's negligence, if considered in order of time and sequence, as plaintiff Perry was negligent afterwards, because he failed to properly exercise care in going upon the crossing without looking and listening before or after he reached the margin of the danger zone, when he had a fair opportunity of doing so, and would have prevented any injury from the defendant's alleged omission (of which there was none), if he had done so. His was clearly the last and final fault in the line of causation, and therefore proximate to the result. But whether he could see or hear, he undertook to do the most hazardous, if not reckless, act by attempting to cross in utter ignorance of whether a train was coming or not. A court of the highest authority has said that where it is known, as it should be, that a railroad company's right of way is being constantly used for its trains, and is at all times liable to be used for their running and operation in transporting freight and passengers, as a public carrier, under the highest legal obligation to serve the public diligently and faithfully as such, "the track itself, as it

seems necessary to repeat with decided emphasis, is itself a warning. It is a place of danger, and a signal to all on it to look out for trains, and it can never be assumed that they are not coming on a track at a particular time when it is being used for the convenience of trespassers or licensees or others, and, therefore, that there can be no risk to a pedestrian, or others, from them." *Treadwell v. R. R.,* 169 N. C., 697.

The sign, "Stop, look, and listen," has far more legal significance than merely as a piece of evidence, or a circumstance of an evidentiary character, and of no more weight or importance than that. As we have shown, the disobedience of the warning is destructive of plaintiff's right to recover. Beach on Contributory Negligence, *supra.* The passage from Beach has been quoted by this Court with approval. As for the blast of the whistle, all of the evidence shows that the usual and customary station and crossing signals were given, and the plaintiff does not deny it, but simply said that he did not know whether they were given or not, as the noise of his car would have drowned the signals if they were given. This is not like saying that he was where he could have heard it, and that he did not hear it. If that had been the case, it is established with us that it would have been some evidence. The rule is, in itself and at best, an unsafe one, as the evidence is negative in its character and lacks the element of certainty. But however that may be, it should not be extended beyond its existing limits; requiring that both parties who testify contrarily should have equal opportunity to hear the sound.

I base my contention that it was plaintiff's duty to *stop, look, and listen,* when he was approaching the zone of danger and before he reached it, and when the precaution would have been of some avail, upon our own authorities, especially upon *Coleman v. R. R., supra* (153 N. C., 322), and upon the special facts of this case, which are not unlike those of other cases, where the case was withdrawn from the jury. We have not held that this duty to "Stop, look, and listen" is *always* one for the jury, but only that "it is usually a question for the jury." *Shepard v. R. R.,* 166 N. C., 545, and the other cases cited in the Court's opinion in this case. It may be negligence as a matter of law in some cases, and this is one of them.

My opinion, also, is that the *Brown case,* relied on by the Court, is not at all like this one. There the plaintiff was held to be negligent in going upon the track, as he did not "stop, look, and listen" before doing so, but he was allowed to recover because the engineer had sufficient time and opportunity to see his danger and did not stop or slow down his train, and was guilty of negligence after he saw the danger, and thus had the last clear chance to prevent the injury.

PERRY *v.* R. R.

The quotation from *Johnson's case,* 163 N. C., 431, is squarely against the plaintiff upon the uncontradicted facts of this case. That case holds that a traveler on the highway, when approaching a crossing, must look, where he can see, or where there is a clear and unobstructed space for him to do so as there was here, it being eight feet wide, according to the testimony of the plaintiff's brother, who was one of his witnesses. In other respects the case is not analogous to this one, as here the plaintiff himself said that the noise of his car prevented him from hearing. This was caused by his own act, and is not imputable to the defendant as negligence. Plaintiff's plain legal duty was to stop his car and its noise, so that he could hear, instead of blindly rushing into danger, especially when there was no necessity or excuse for his doing so.

The remaining argument of the Court is fully answered when we consider that plaintiff himself testified that he could have heard the rumbling of the train for a quarter of a mile away if it had not been for the noise of his own car, and he would have heard the whistle blast but for the same noise. What difference can it make whether it is the noise of the bell, whistle or train if it is sufficient to give notice of the train's approach in the absence of plaintiff's own noise?

In their essential facts this case and that of *Hurst v. R. R.,* recently decided by this Court, are "on all fours" with each other, and cannot be successfully distinguished. In the *Hurst case,* as I read it, the decision of the Court did not depend upon the condition of the crossing, nor is it of less weight as an authority because the Court deemed an opinion unnecessary, the ruling below being considered too plainly right for discussion.

There are other important exceptions raising questions of serious moment, and certainly fit to be considered, but I will have to forbear consideration of them, as the question raised and already considered has prolonged this opinion far beyond my intention. One matter I will notice before concluding. As plaintiff admits the noise of his own car would drown the noise of the train and the whistle, his testimony as to not hearing the whistle of the train was of no value, and was not, under the ordinary rule, competent to be heard, while the positive testimony as to the whistle being blown was all one way, and the witnesses had full opportunity to hear, being near the train. The law that where a witness states that he did not hear the whistle it is some evidence that it was not sounded does not apply where others testified that they were near the train and did hear it, unless he had equal opportunity with them to hear it. The rule depends upon equality of opportunity. Here the plaintiff had practically no such opportunity, as the noise of his car completely deadened the noise of the train and that of the whistle. The noise of the train was certainly there, and yet he did not hear it, because,

as he says, the noise of his car prevented. The others did hear, because nothing interfered with their doing so.

In any possible or, at least, reasonable view of the case the plaintiffs, in my opinion, should have been nonsuited.

BROWN, J., concurs in the dissenting opinion.