MARGARET BLUM, EXECUTRIX, v. SOUTHERN RAILWAY COMPANY ET AL.

(Filed 30 April, 1924.)

1. **Negligence—Railroads—Grade Crossings—Signals—Evidence.**

It is incumbent upon a railroad company, under the common law, unaided by statute, to give proper warnings of the approach of its trains by the timely sounding of the locomotive whistle and the continuous ringing of its bell at a public highway crossing at grade, commensurate with the dangerous condition existing there; and the question discussed by *Clark, C. J.,* as to whether the absence of an electric gong, automatically rung by the passing locomotive in advance of its approach, may also be received upon the issue of actionable negligence, in accordance with the finding of the jury as to whether the danger to life and limb would require it under the existence of the dangerous conditions as found by them under the evidence in this case.

2. **Same—Contributory Negligence—Evidence,**

Where the driver of an automobile was killed by the negligence of a railroad company at a grade crossing with a public highway, under conditions that would have rendered it impossible for him to have seen or apprehended the approach of the defendant's train before entering upon the track at the time of the collision, his failure to have stopped before attempting to cross the track will *not* bar the recovery of damages for his wrongful death, or affect the negative finding of the jury upon the issue of contributory negligence.

ADAMS, J., concurs in result. Concurring opinion by STACY, J.

APPEAL by defendants from *Harding, J.,* at October Term, 1923, of MECKLENBURG.

This action was brought to recover damages for the wrongful death of the husband of the testator, who was killed at a grade crossing over the tracks of the defendant, at Linwood, near noon, on 26. September, 1922. The automobile, in which he was riding with Mr. Robert J. Hayes, on the highway from Charlotte to Lexington, was struck by

defendant's train, running south an hour and ten minutes late, and at about 45 miles an hour, instantly killing them both as they came through an opening in a string of box cars stored on each side of the crossing and along a sidetrack immediately adjacent and parallel with the main-line track on which the train was running. These box cars cut off the view of the deceased and his companion of the train as it approached the crossing.

The usual issues of negligence, contributory negligence, and damages were submitted to the jury, and answered in favor of the plaintiff, and her damages assessed in the sum of $32,000. From the judgment on the verdict the defendants appealed.

*John M. Robinson and W. S. O'B. Robinson, Jr., for plaintiff.*
*O. F. Mason and F. M. Shannonhouse for defendants.*

CLARK, C. J. The defendants rely upon the refusal of a nonsuit, errors in the admission of evidence and in the charge, and the refusal of the court to give certain instructions. The exception because of refusal to nonsuit requires no discussion.

The defendants excepted to the admission of evidence as to the use of gongs at other crossings. This Court has repeatedly said that, where there was a grade crossing, it was incumbent upon the defendant rail-road company to give notice of the approach of its train by blowing the whistle or sounding the bell or ringing a gong, and, in proper circumstances, having a watchman to lower gates; which of these precautions should be taken being a matter of evidence upon the surroundings and the facts of the particular case. *Dudley v. R. R.,* 180 N. C., 36.

In many of our States, as in all other countries, the railroads have been required to be constructed without grade crossings; and where this was not done, in many States they have since been required to abolish them because of their interference with the right and safety of the public to use their own highways, which right is superior to that of eminent domain, by which railroads have been authorized to be operated for the public convenience and for profit to its owner, but in subordination to the rights of the public. Being useful to the public, they are held *quasi*-public corporations, but have been granted the right of eminent domain, to take private property for their use as right of way, subject to public regulation as to their conduct and charges.

In this State the Corporation Commission was authorized, in 1907, to require the abolition of all grade crossings of the public highways by railroad tracks wherever desirable (C. S., 1048), and this has been done, according to a recent report of the Highway Commission, in a great many cases. It had not been done, however, in this particular locality. Where it has not been done, there is recognition of the right of the

41—187

public to use its own roads with safety to life and limb from the operation of trains, by requiring fullest notice of the approach of a train by the engineer blowing a whistle and ringing a bell, and by installing electric gongs, where necessary, to warn travelers, and in all much-frequented places they have gates and custodians to keep them. *R. R. v. Goldsboro,* 155 N. C., 359, 363, approved on writ of error, 232 U. S., 548, and citing cases in Anno. Ed.

In Germany, for forty years, the approach of trains to railroad stations has been announced by electric gongs, operated automatically by the wheels of the engine making an electric circuit as it passes over a device located several hundred yards distant, which rings a gong over the annunciator in the station, giving notice as to what train is arriving, instead of by the human voice, as is usual here. The same device is often used by some railroads here, including defendants, to give warning at crossings, in addition to signals by whistle and bell. These matters have been often sustained by decisions in this Court.

In this State there are over 5,500 miles of railroad tracks, and very many times as large a mileage of roads owned by the public, over which latter there now pass constantly 250,000 automobiles and motor trucks licensed by the State, besides horse-drawn vehicles many times as numerous, and other conveyances of both kinds from other States. These carry an immense number of persons and a vast quantity of freight.

As vehicles pass along the public roads far more frequently than do trains along the tracks, it has always been held reasonable that the railroads should be required to give notice by signals and, where necessary, by gates or gongs, of the approach of one of their dangerous agencies, so that the traffic and travel by the public over their own public roads shall be protected from unnecessary dangers from railroad trains. The railroad companies are granted existence by legislation and are operated for private profit in this country, though, it is true, in all other countries, with rare exceptions, they are the property of the Government and operated like the postoffice or the army or navy, or, like our railroads were during the war, by the Government.

In this case the evidence comes largely from the defendants' own witnesses, and upon it the jury found that the death of the plaintiff's testator was caused by the negligence of the defendants, and that he was not guilty of contributory negligence.

The defendants' tracks at the point in question (Linwood) run practically north and south, and the intersecting highway, along which Mr. Blum and his companion were traveling eastward, ran practically east and west. There are three railroad tracks at that point over the crossing. The western one is a sidetrack, upon which the box cars were stored at the time of the accident. The second or middle track is the

main-line track, for southbound trains, upon which the train in question was running; and the third or eastern track is the main-line track for northbound trains. The distance between the center line of the side-track and the center line of the southbound track at this point is 13 feet. The crossing in question is known as the "depot crossing"; 790 feet to the north is the "Lexington crossing," and 1,917 feet north of the Lexington crossing is what the witnesses called the "farm road crossing." The station-blow post for the Linwood depot is 5,402 feet north of the depot crossing. The southbound whistle-post for the depot crossing is 1,429 feet north of the center of the crossing. The station-blow post for southbound trains, which this was, is around a curve in the track and is located in a slight cut. Further on, towards the station, from this blow-post, the cut gets deeper, up to an 18- or 20-foot cut, and at 300 feet from the station-blow post it is about a 15-foot cut. The grade of the railroad tracks from the station-blow post ascends for the first 3,500 feet, but from a point 2,300 feet north of the depot crossing it is down grade to the crossing and beyond.

Approaching the crossing on the highway from the west, going east, as the deceased was traveling, there are obstructions on the north or left-hand side of the highway, such as trees and buildings, so that, even if there had been no box cars banked along the sidetrack, persons approaching the crossing from the west, going east, could scarcely have seen a train approaching from the north, going south, as this train was. The right of way of the railroad is 100 feet on each side of the center line of the tracks, and the permanent obstructions referred to are, therefore, located partly on the right of way.

J. O. Lee, a witness for the defendants, who passed over the crossing, shortly before the deceased and his companion, testified that the conditions existing at the crossing made it "a death-trap." Fourteen box cars were parked to the south of the crossing and forty-seven to the north, from which direction the train came, with a narrow opening left at the crossing, through which travelers were required to pass. The box cars extended 1,980 feet north of the depot, with another opening left in the line at the Lexington crossing. The accident happened Thursday, 26 September, 1922, and the box cars had been standing parked on each side of the crossing since the Saturday before.

Many witnesses, for both the plaintiff and defendants, agree that it was impossible for a traveler along the highway going east to have seen a southbound train until the front wheels of his automobile were on the southbound track, where it would be struck by that train.

According to the evidence, there were no precautions of any nature whatever for the protection of travelers at the crossing made by the defendants, notwithstanding that the crossing was a part of the public

highway and the principal public road in the village of Linwood, and had been a public highway for thirty years. According to the evidence, an automobile passed over this crossing every five or six minutes, day and night. About forty trains a day were operated over the crossing, many of them through trains, which did not stop at Linwood.

The answer admits that the train which killed the deceased was running forty to forty-five miles an hour, and was an hour and ten minutes late, by its schedule, and that box cars were stored along the sidetrack, on each side the crossing, as above stated. The great weight of the evidence is that this fast train—forty-five to fifty miles an hour—came down this long grade approaching the depot crossing, running alongside of the string of box cars stored on the sidetrack, without slackening its speed or giving any warning, by bell or whistle, of its approach, and struck and killed the deceased and his companion just as their automobile passed through the opening in the string of box cars, and reached the southbound track without giving them time or opportunity to see or hear the approaching train.

F. H. Bell, a witness for the defendant, standing on the depot platform, on the west side of the crossing, testified that he saw the train coming, and that in his judgment it was running as rapidly as he ever saw any train on this railroad; that it did not slacken its speed at all as it approached the crossing, and that, though he stood on the platform and saw it approach, he was not conscious of ever having heard it blow a whistle or ring a bell, and saw no other indication that the engineer knew he was approaching the crossing, and that it was impossible for the deceased to have seen the approach of the train until the front wheels of his automobile got on or near the first rail of the main line of the southbound track. It is admitted that the string of box cars parked to the north of the crossing completely hid the whistle-post for the crossing, so that, as the engineer came down the track towards the crossing, he could not see the whistle-post, which was located 6 or 7 feet on the west side of the string of box cars, and was not over 5 or 6 feet high.

The engineer, who was a witness for the defendants, said that he could not keep in mind how many whistle-posts there were on his run between Greensboro and Spencer, and that the only way he knew when and where to blow for a crossing was by seeing the whistle-post, and that he was guided by the whistle-posts in blowing for the road crossing. He further said that, if he should happen to miss one, he would not blow, for they were put there to direct the engineer when and how to blow the whistle. He said that the whistle-posts had two black stripes and two black dots, and the crossing signal was two long blasts and two short ones, and that the rules of the company required him to blow these signals for the stations and for the road crossings, and to keep his

bell ringing over all road crossings. This engineer further testified that, as he ran his train down the track, the box cars on the parallel sidetrack were so located that a man in an automobile could not see his train until he got directly on the track, and that he ran his train down grade across the Linwood crossing at such speed that he could not stop it inside of 250 yards; that he made no attempt to reduce the speed of his train as it crossed the Linwood crossing; that he was running under steam and did not cut the steam off going down the grade. He further testified that the front end of the pilot of his engine was within 6 or 8 feet of the automobile when he first saw it, and at that time the front wheels of the automobile were just across the first track as he saw the driver coming out in the gap between the line of cars, and his engine struck the automobile just as it came upon the track.

Mr. Fitzgerald, the postmaster at Linwood, another witness for the defendants, testified that he was at the postoffice, just west of the crossing, waiting to receive the mail, and was particularly interested to hear the train blow, and only heard it blow once, and did not know how far it was up the track. If this was the station blow (which was one blow), the station-blow post, according to the evidence, was a mile north of the crossing and around a curve, and hence gave no warning of the train's approach to travelers along the highway, who were at that time probably a third of a mile or more from the crossing. The rules of the company, according to the evidence, required two long blasts and two short blasts to be given at the whistle-post for the Linwood crossing, 1,429 feet north of the crossing, and also required the bell to be kept ringing as the train passed over the crossing. Fitzgerald testified that he did not hear any bell ring, and only heard one blow somewhere up the track, though he was particularly listening for .the train, and that, on account of the buildings and trees on the north side of the highway as the railroad crossing is approached from the west, a man driving an automobile could not see this train going south, on account of the string of box cars and the buildings.

There were several other witnesses introduced by the defendants, who testified that they heard one long blow, some distance up the track, but that they heard the train give no signal or warning of its approach to the depot crossing, either by bell or whistle, though several swore that they listened after they heard the one blow far up the track.

Mr. Bell, the defendants' witness, testified that as the deceased and his companion approached the crossing they were driving about ten miles per hour; that if they had.stopped at the crossing before proceeding across the track they could not have seen the approaching train.

Mr. Lee, a witness for the defendants, who immediately preceded the deceased over the crossing, testified that he stopped his car before cross-

ing, trying to get a view of the tracks, and was unable to do so; that the box cars entirely obstructed the view of the tracks.

In *Hinkle v. R. R.,* 109 N. C., 472, which was in regard to a crossing accident at Linwood, *Justice Avery* said: "It is negligence *per se,* because of the peril, both to passengers on trains and people using highways, to omit to give in reasonable time some signal from a train moving, whether at the rate of twenty or forty miles an hour, when it is hidden from the view of travelers who may be approaching and in danger of coming in collision with it, by the cars of the company left standing on the track," citing numerous cases. And "Where a railroad company has erected a whistle-post at a proper distance from a crossing in order to notify engineers when to give timely warning of the approach of a train to persons using the intersecting highway, and the purpose of the company is known to the public, so that persons generally are led to act on the supposition that a signal will be given at the post, it is negligence on the part of the company if the engineer failed to sound the whistle at the point so indicated in passing with a freight or passenger train in his charge." This has been approved by the courts at least thirty times and as late as *Jackson v. R. R.,* 181 N. C., 153.

The fact that the omission to give notice by a blast of the whistle or the ringing of a bell, or both, is negligence, and that it cannot be said to be contributory negligence as a legal conclusion if the failure to stop was caused by the breach of duty of the defendant in failing to give such notice by bell or whistle, is clearly stated in an elaborate opinion by *Allen, J.,* in *Perry v. R. R.,* 180 N. C., 298, in which it is said: "Notice by bell or whistle is required, because the noise of the train, which is always present, is not an efficient protection to life and property, and when the defendant has by its negligence permitted obstructions on its right of way, so that the traveler cannot see, and has failed to give the proper signal, which he has a right to expect, as a train approaches, the defendant ought not to be absolved from the consequences of its negligence, because the traveler, relying upon the performance of duty by defendant, might have heard the noise of the train if he had stopped." There was evidence fairly submitted to the jury to justify their finding the above state of facts, and the charge is almost in the exact language of the Court in *Perry v. R. R., supra,* which followed the previous decisions in *Goff v. R. R.,* 179 N. C., 216; *Shepard v. R. R.,* 166 N. C., 544; *Jenkins v. R. R.,* 155 N. C., 203; *Hinkle v. R. R.,* 109 N. C., 472.

After a careful examination of the exceptions to the evidence and the charge, we think this case was fairly and fully presented to the consideration of the jury, and that their verdict is untainted by any error of the court, either in the evidence or in the charge.

The defendants, in the absence of other ground, stress greatly their exception to the admission of evidence that automatic electric railroad gongs, to give notice of the approach of trains at a crossing, were used at other crossings on this railroad, and, indeed, at two other crossings in this county. Such gongs are a well-known appliance, often used for the purpose of giving warning to travelers at a crossing of an approaching train, and their use as a safety device at crossings was well known to the defendants, and witnesses testified to their efficiency. Witnesses testified that this railroad had automatic gongs at several other crossings—one at Reidsville, one between Greensboro and Pomona, and one at Danville—and that these gongs were placed at the highway crossings to warn the public, so that one driving an automobile could hear them far enough away to keep from getting on the track. But it is needless to discuss this matter further, for, at the request of the defendant, the court withdrew this evidence from the consideration of the jury. The court instructed the jury as follows: "There is no statute or other law of this State requiring railroad companies to install or maintain bells, gongs, gates, or watchmen at railroad crossing to warn travelers on the public road, and the court charges the jury that the defendants in this case were not negligent in not having or maintaining an automatic or other bell, gong, gate, or watchman at the crossing at which the plaintiff's testator was killed; that the law prescribes the duties of the defendants; and, therefore, if, out of extra precaution, they maintain automatic bells or gongs at other road crossings, such action on their part would not impose on them any duty to maintain such a device at the crossing where Mr. Blum was killed; and the jury are instructed not to consider the absence of such a device in passing on the question whether the defendants were negligent on the question of the proximate cause of the death of plaintiff's testator."

This instruction was given at the prayer of the defendant, and he cannot complain. There was error against the plaintiff in giving this instruction that the jury should not consider it negligence that the defendants did not maintain automatic gong or other safety device at the crossing in question, and instructing them not to consider the absence of such a gong or other safety device in passing upon the first issue. This was a matter for the jury upon the evidence.

In *Dudley v. R. R.,* 180 N. C., 34, this Court said: "It was not error for the court to permit the plaintiffs to offer evidence that there was no automatic alarm or gates at the crossing, and the court properly left it to the jury to say, upon all the attendant circumstances, whether the railroad company was negligent in not erecting gates. It was incumbent upon the defendant to take such reasonable precautions as were necessary to the safety of travelers at public crossings. 22 R. C. L., 988.

This was a question of fact for the jury. That the city authorities assented that a watchman should be stationed at the crossing was not conclusive upon the plaintiffs if, in the opinion of the jury upon the evidence, this was not sufficient protection to the public."

To the same effect as the *Dudley case,* we refer to the authorities heretofore cited, particularly 22 R. C. L., 990.

The court's instructions to the jury that, as a matter of law, the defendants were not negligent in not maintaining an automatic gong or other safety device at the crossing, and that they could not consider the absence of such a gong or other safety device in passing on the first issue, are in direct conflict with the law as declared in the *Dudley case* and with the very great weight of authority in other jurisdictions; and this, notwithstanding the undisputed evidence as to the dangerous character of the crossing and its almost constant use as a public highway.

The trial court evidently so charged, out of abundant caution. It is true, there is no statute in this State requiring railroad companies to install automatic gongs or maintain gates or keep watchmen at crossings, but, as this Court has said, in *Dudley v. R. R., supra,* the absence of such statutory directions does not relieve the railroad companies of the obligation to exercise reasonable care for the safety of travelers at crossings. No statute requires railroad companies to give warning of the approach of a train to a crossing, by bell or whistle, but the duty to do so arises by virtue of the common law, and is but an incident of the duty imposed upon railroad companies in running their trains over public highways to take all reasonable precautions for the safety of travelers using such highways. The duty includes the obligation to maintain such safeguards as common prudence would direct, and the jury could consider (if the court had not withdrawn it) that these electric gongs were in use by the defendants at other stations and crossings.

Where the statute requires the use of certain safety devices for the protection of passengers, employees, or the public, the failure to install them is negligence, as a matter of law; but where they are not prescribed by statute, the failure to use a given safeguard can be submitted to the jury as a fact upon the issue of negligence.

In *Greenlee v. R. R.,* 122 N. C., 977, there had been no statute requiring a railroad to equip its freight cars with modern self-coupling devices, but this Court held that it was negligence *per se* not to do so, in view of the large number annually killed or wounded by failure to do this. And this was followed and approved in *Troxler v. R. R.,* 124 N. C., 189, holding that the failure to furnish such safety appliances was culpable, continuing negligence on the part of the employers, which cut off the defense of contributory negligence and the negligence of a fellow-servant,

and of assumption of risk, and these decisions have since been made statutory, and the same principle has been applied to other machinery. It is not necessary, therefore, that the adoption of a safety appliance should be required by statute before its absence shall become evidence of negligence to be submitted to a jury.

In this case, there being evidence that an automatic gong was in use by defendants as a safety device at other highway crossings to give notice to travelers in time to prevent their attempting a crossing, it became a question of fact for the jury to say whether the defendants were negligent in not maintaining such an automatic gong at this crossing, at which plaintiff's testator was killed, especially in view of evidence as to the very dangerous character of the crossing.

In *R. R. v. Dandridge,* 171 Fed., 74 (U. S. C. C. A.), the Court said: "The third assignment presents the question of error in the trial court's allowing plaintiff to testify to the absence of a gateman or electric bells at the crossing, because neither were required by statute. Manifestly, the nonexistence of such a statute did not forbid the asking of the question and the answer to the same, as common prudence on the part of the company might have required such safeguards, in the absence of statutory regulations. *R. R. v. Ives,* 144 U. S., 419-421."

In *R. R. v. Wiggins* (Texas), 161 S. W., 445, it is said: "The settled rule in reference to the issue here raised is that, if a person of ordinary prudence would, under all the circumstances, have maintained a flagman or watchman at the crossing, where the plaintiff was injured, then the failure on the part of the railroad company to keep such flagman or watchman was negligence."

In *Annaker v. R. R.,* 81 Iowa, 267, it is said: "Whether such omission is negligence depends upon the circumstances, such as the frequency with which trains are passing, the amount of travel, the opportunities, or want of opportunities, for travelers observing the approach of trains, and the like."

Many additional authorities to the same effect, in our Reports and elsewhere, are to be found. The court having withdrawn this subject from the consideration of the jury, fuller discussion is not necessary. But, as said in *Dudley v. R. R., supra,* upon evidence that there were no automatic electric gongs or gates at this crossing, the court might properly have left it to the jury to say, upon all the attendant circumstances, whether the railroad company was not negligent in not providing such safeguards.

Upon careful examination, we find no error in the instructions to this matter, which is fully discussed in *R. R. v. Ives,* 144 U. S., 408, where it is said that the general rule is "well stated in *R. R. v. King,* 86 Ky., 589, as follows: 'The doctrine with reference to injuries to

those crossing the track of a railway, where the right to cross exists, is that the company must use such reasonable care and precaution as ordinary prudence would indicate.'" It also quotes *R. R. v. Perkins,* 125 Ill., 127, where it was held that "the fact that a statute provides certain precautions will not relieve a railway company from adopting such other measures as public safety and common prudence dictate. And in *Thompson v. R. R.,* 110 N. Y., 636, where it was held that giving the signals required by law by a railroad train approaching a street crossing does not, under all circumstances, render the railway company free from negligence," citing; also, *R. R. v. Commonwealth,* 13 Bush., 388; *Weber v. R. R.,* 58 N. Y., 451, and concludes as follows: "The reason for such ruling is found in the principle of the common law that every one must so conduct himself and use his own property as that, under ordinary circumstances, he will not injure another in any way. As a general rule, it may be said that, whether ordinary care or reasonable prudence requires a railroad company to keep a flagman stationed at a crossing that is especially dangerous, is a question of fact for the jury to determine, under all the circumstances of the case, and that the omission to station a flagman at a dangerous crossing may be taken into account as evidence of negligence," adding that where the crossing is a much-traveled one, and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard, by reason of the bustle and confusion incident to railway or other business, or by reason of some such like cause, a jury would be warranted in saying that the railway ·company should maintain these extra precautions at ordinary crossings in the country, citing numerous cases.

That case has been cited and approved on this point by numerous cases since, which hold that "a railroad is not excused for negligence by mere compliance with statute; it must take necessary precautions." 15 Rose's Notes, 1213, and cases there cited; and *R. R. v. Dandridge, supra,* and cases citing ·the same. Indeed, upon the evidence in this case, it would seem that the jury could have had no doubt, if the matter had not been withdrawn from their consideration, that if an automatic gong had been installed at this place it would have given such notice to the plaintiff's testator and his companion that it would have prevented this accident; at least, they would have been justified in drawing the inference that the failure to do so was negligence on the part of the defendants.

Neither do we find any error upon the issue as to contributory negligence, either in the instruction given or in those refused. There is no exception upon the third issue, as to damages, nor did defendants move that the verdict be set aside upon the ground that the damages awarded were excessive. Indeed, whether the damages in any case are inadequate

or excessive is a matter which rests solely in the sound judgment of the trial judge, and we have often held that this is not reviewable in this Court. *Benton v. Collins,* 125 N. C., 94; *Burns v. R. R., ibid.,* 306; *Gray v. Little,* 127 N. C., 306.

Upon the evidence, the plaintiff's testator, at the time of his death, was 47 years of age, an expert electrical engineer and a member of the American Institute of Electrical Engineers, earning more than $5,000 a year. The evidence was that he was a man of the most unusual industry and energy, and that his general character was excellent. Indeed, is was not contended in the court below that the damages awarded were excessive or even large, and it is not so contended in this Court.

After careful examination of all the exceptions, we find

No error.

ADAMS, J., concurs in result.

STACY, J., concurring: The record presents several serious exceptions; but, upon a careful investigation, it seems to me that they may be resolved in favor of the validity of the trial, without doing violence to any legal principle. For this reason, I concur in the result.

The question as to whether the trial court erred in charging the jury that "the defendants in this case were not negligent in not having or maintaining an automatic or other bell, gong, gate, or watchman at the crossing at which the plaintiff's testator was killed," because not required by statute, is not before us for decision. This instruction was given at the request of the defendants, and, of course, it forms the basis of no exception on the present record. The plaintiff alone could object to the instruction, and she is not appealing.